UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>GABRIEL VICENTE ARAUZA<br><br>Defendant. | No. 2:18-cr-00202-TLN<br><br><br><br>**ORDER** |

This matter is before the Court on Defendant Gabriel Vicente Arauza's ("Defendant") Motion to Suppress Evidence. (ECF No. 30.) The Government filed an opposition. (ECF No. 32.) Defendant filed a reply. (ECF No. 33.) For the reasons set forth below, the Court DENIES Defendant's motion.

///
///
///
///
///
///
///
///

1

### I. FACTUAL AND PROCEDURAL BACKGROUND

At the time of the search at issue, Defendant was on Post Release Community Supervision ("PRCS") for a 2017 conviction for violating California Health and Safety Code § 11378 and California Penal Code § 29800(A)(1). (ECF No. 32-2 at 8.) Defendant's conditions of PRCS included warrantless search conditions and a requirement to keep probation informed about his current place of residence or any changes to his residence. (ECF No. 32-1 at 2.) On August 1, 2018, Defendant's wife informed Probation Officer Michael Sanders ("Officer Sanders") that Defendant no longer lived at his reported address, 4997 46th Street in Sacramento, California. (*Id.*) When Officer Sanders contacted Defendant via telephone, however, Defendant claimed he still lived at his reported address. (*Id.*) Shortly after this call, Officer Sanders learned Defendant was the suspect in a domestic violence disturbance at the residence and Defendant's wife was the reporting party. (*Id.*)

Officer Sanders then initiated an investigation to ascertain Defendant's true residence and any related criminal activity. (*Id.* at 3.) On August 2 and August 7, 2018, Officer Sanders attempted to visit Defendant at the 4997 46th Street address, but there was no answer at the front door on either occasion. (*Id.*) On August 8, 2018, Officer Sanders successfully contacted Defendant at the 4997 46th Street address. (*Id.*) During the visit, Defendant told Officer Sanders he resided there. (*Id.*) However, Officer Sanders observed Defendant did not have any clothes or belongings in the residence. (*Id.*) Defendant explained his clothes and other personal items were at his sister's house and he had to move them back in. (*Id.*) Later that same day, Officer Sanders observed Defendant drive to the Greenridge Apartments located at 5399 47th Avenue in Sacramento, California ("Greenridge Apartments"). (*Id.*) Defendant parked in spot 48, directly in front of Apartment 245. (*Id.*) Officer Sanders then saw Defendant walk down a breezeway toward Apartment 245, but he did not see Defendant actually enter the apartment. (*Id.*)

On August 26, 2018, Officer Sanders received two pictures from Defendant's wife via text message. (*Id.* at 4.) The two pictures were of Defendant's wife's face, and she appeared to have a black eye. (*Id.*) On August 27, 2018, Officer Sanders conducted surveillance and observed Defendant standing outside the residence at 4997 46th Street. (*Id.*) Defendant entered a vehicle

parked outside the residence and drove away.  (*Id.*)  Later that day, Officer Sanders contacted Defendant's wife via telephone.  (*Id.*)  Defendant's wife informed probation that she and Defendant were trying to reconcile, but she stated Defendant was still not living with her at the 4997 46th Street address.  (*Id.*)

On August 29, 2018, at approximately 12:30 p.m., Officer Sanders and a team of officers observed Defendant driving to the Greenridge Apartments.  (*Id.* at 5.)  After Defendant parked his vehicle, the officers activated their emergency lights and contacted Defendant while he was still in the vehicle.  (*Id.*)  As Defendant exited the vehicle, one of the officers observed him toss a shiny object into a grassy area nearby.  (*Id.*)   Another officer retrieved the object during a search of the area and found a "clean and unweather[ed]" house key.  (*Id.* at 6.)  The officers then searched Defendant's vehicle and found two cell phones, a Samsung and an LG Cricket.  (*Id.* at 5.)  Defendant denied owning the LG Cricket phone, but he admitted the Samsung phone was his and gave the officers his passcode for the phone.  (*Id.* at 6.)  The officers searched text messages on Defendant's phone and found several pictures and videos of "large amounts of suspected methamphetamine, cocaine, and a large zip lock bag of U.S. currency."  (*Id.*)  The officers also found a video on the phone that showed Defendant "racking the slide of a firearm."  (*Id.*)

At approximately 1:30 p.m., the officers spoke with apartment staff who confirmed Defendant came to the Greenridge Apartments often.  (ECF No. 32-1 at 6–7.)  The apartment staff also confirmed seeing Defendant drive a white SUV with large white rims and park the vehicle in spot 48, a reserved parking spot for Apartment 245.  (*Id.* at 7.)  Officer Sanders notes he had observed Defendant driving a white SUV with large white rims in the past.  (*Id.*)  The apartment staff reported they had also observed Defendant park another vehicle in spot 48 on several occasions.  (*Id.*)  The apartment staff stated the apartment was leased by Brittney May Beltran, whom they had observed entering and exiting Apartment 245 regularly.  (*Id.* at 7.)  Officer Sanders asserts at this point, based on his training and experience, he suspected Defendant was concealing a residence within Apartment 245 to further his criminal activity.  (*Id.*)

At approximately 2:15 p.m., Officer Sanders knocked and announced the officers' presence at Apartment 245.  (*Id.*)  There was no response.  (*Id.*)  Officer Sanders reports that after

a reasonable time, he used the key found near Defendant's vehicle to enter the apartment.  (*Id.* at 7–8.)  Once inside, the officers engaged in a protective sweep to ensure no one else was present in the apartment and found no other individuals.  (*Id.* at 8.)  While conducting the protective sweep of a bedroom, the officers observed a clear plastic bin containing suspected methamphetamine and a small table covered in a white crystal substance.  (*Id.*)  The officers also observed a large digital scale on the table along with several boxes of plastic sandwich bags, which Officer Sanders knew were often used to weigh and package methamphetamine for sale.  (*Id.*)

Next, Officer Sanders reviewed the pictures in Defendant's cell phone.  (*Id.*)  Officer Sanders reports he saw pictures of what appeared to be Defendant's hand holding a large amount of suspected methamphetamine on the kitchen table of Apartment 245 dated August 28, 2018.  (*Id.*)  Officer Sanders also saw pictures and videos depicting large amounts of suspected cocaine dated July 6, 2018.  (*Id.*)  The pictures and videos contained GPS location data, which Officer Sanders entered into Google Maps.  (*Id.*)  The GPS location data showed that the pictures and videos of the suspected cocaine were taken directly where Apartment 245 was located.  (*Id.* at 8; *see also* ECF No. 32-3 at 2.)  The video of Defendant racking the slide of a firearm, dated April 26, 2018, appeared to have been recorded inside of a parked vehicle near the Greenridge Apartments.  (ECF No. 32-1 at 8.)

At approximately 2:30 p.m., the officers froze the apartment in order to obtain a search warrant.  (*Id.* at 9.)  A superior court judge reviewed and signed the warrant, and the officers executed the search warrant at approximately 8:30 p.m.  (*Id.*)  During the search, the officers retrieved approximately 30.5 pounds of methamphetamine, several rounds of live ammunition, approximately 3 grams of heroin, and other indicia of a drug distribution operation.  (*Id.* at 9–11.)

On October 4, 2018, a grand jury returned an indictment charging Defendant with a single count of possession with intent to distribute over 500 grams of methamphetamine (mixture/substance) in violation of 21 U.S.C. § 841(a)(1).  (ECF No. 8.)  On February 5, 2020, Defendant filed the instant motion, arguing the evidence found in Apartment 245 was obtained from an illegal search and should be suppressed.  (ECF No. 30.)

///

## II.     STANDARD OF LAW

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *Morgan v. United States*, 323 F.3d 776, 781 (9th Cir. 2003). In general, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

The exclusionary rule "often requires trial courts to exclude unlawfully seized evidence in a criminal trial." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Id.* (internal quotation marks omitted). However, the Supreme Court has stated, "the significant costs of this rule have led us to deem it applicable only . . . where its deterrence benefits outweigh its substantial social costs." *Id.* (citation and internal quotation marks omitted). The Supreme Court has thus carved out certain exceptions to the exclusionary rule because "[s]uppression of evidence . . . has always been our last resort, not our first impulse." *Id.* (citation omitted).

"Three of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence." *Id.* "First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Id.* (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)). "Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 443–444 (1984)). Third, under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been

5

interrupted by some intervening circumstance." *Id.* (citing *Hudson v. Michigan*, 547 U.S. 586, 591, 593 (2006)).

### III.   ANALYSIS

Defendant argues the initial search of Apartment 245 was unlawful for two reasons. First, Defendant argues there was no justifiable reason for a protective sweep of Apartment 245. Second, Defendant argues a warrantless search based on his PRCS status was improper because: (1) Defendant's PRCS status did not justify a warrantless search; and (2) even if he was subject to a warrantless search of his residence a result of his PRCS status, the officers lacked probable cause to believe Defendant resided at Apartment 245.

In opposition, the Government argues the search of Apartment 245 was a valid PRCS search. Next, the Government argues discovery of the evidence in Apartment 245 was "inevitable" within the meaning of the inevitable discovery doctrine because the search warrant was supported by independent evidence unrelated to the protective sweep. Finally, the Government argues the officers saw the challenged evidence in plain view while conducting a lawful protective sweep of the apartment.

As will be discussed in more detail below, the Court finds the evidence from Apartment 245 is admissible under the independent source doctrine even if the officers' initial entry was unlawful. Therefore, the Court need not and does not address whether the officers' search of Apartment 245 constituted a valid PRCS search or protective sweep. *See United States v. Ankeny*, 502 F.3d 829, 837 (9th Cir. 2007) ("Ultimately, we need not determine whether the entry was unreasonable because . . . suppression is not appropriate in any event.").

A.   Inevitable Discovery Doctrine/Independent Source Doctrine

The Government argues that even if the initial entry into Apartment 245 was unlawful, the evidence inevitably would have been discovered when the officers subsequently executed the search warrant, which was based on sufficient untainted information to support a finding of probable cause. (ECF No. 32 at 19.) In reply, Defendant argues the inevitable discovery doctrine does not apply when officers have probable cause to apply for a warrant but simply fail to do so. (ECF No. 33 at 10–12 (citing *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995); *United*

*States v. Lundin*, 817 F.3d 1151, 1161 (9th Cir. 2016).)

As a general matter, Defendant is correct. In *Mejia*, the defendant confessed to processing counterfeit currency at his home and consented to a search of his home. 69 F.3d at 311. Without seeking a warrant, the officers searched the home and found the counterfeit currency. *Id.* The defendant later moved to suppress the evidence seized from his home. *Id.* at 319. The government argued the inevitable discovery exception excused the officers' failure to obtain a warrant because "a warrant would have issued if the detectives had sought one." *Id.* In rejecting the government's argument, the court stated it was "unclear whether there was competent evidence that would have supported an application for a warrant" and emphasized the court "has never applied the inevitable discovery exception . . . where the police had probable cause but simply did not attempt to obtain a warrant." *Id.* at 321–20. The court further emphasized, "To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement." *Id.* at 320.

Similarly, in *Lundin*, officers knew they had probable cause to arrest the defendant for committing numerous violent felonies. 817 F.3d at 1162. Armed with probable cause — but no warrant — officers arrived at the defendant's home, arrested the defendant, and searched inside and around the home. *Id.* The officers found and seized two firearms on the back patio of the home. *Id.* The defendant moved to suppress the firearms, and the government argued the inevitable discovery doctrine applied. *Id.* at 1161. The district court rejected the government's argument and suppressed the firearms. *Id.* at 1162. The Ninth Circuit affirmed, again emphasizing the inevitable discovery doctrine does not apply when an officer chooses not to get a warrant. *Id.* In sum, Defendant is correct that *Mejia* and *Lundin* stand for the proposition that the inevitable discovery exception does not allow an officer to circumvent the warrant requirement simply by claiming there was probable cause to support a warrant had he chosen to get one.

However, *Mejia* and *Lundin* are distinguishable from the instant case. Unlike *Mejia* and *Lundin*, the officers here *did* subsequently obtain a search warrant based on an affidavit that included both allegedly tainted evidence from the protective sweep and untainted evidence unrelated to the sweep. This factual distinction is critical because the Ninth Circuit has

7

repeatedly held "[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant." *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) (citing *United States v. Driver*, 776 F.2d 807 (9th Cir. 1985). Indeed, even when evidence is initially discovered during an illegal entry, courts have applied the independent source doctrine to admit the evidence when a later executed warrant contains sufficient untainted evidence to establish probable cause for the search.[1] *See Murray*, 487 U.S. at 538–39 ("[I]nformation which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source."); *Driver*, 776 F.2d at 811 ("We now must determine whether there is an independent source for the discovery of the later evidence seized, unrelated to the initial illegal entry and search pursuant thereto."); *United States v. Salas*, 879 F.2d 530, 537 (9th Cir. 1989) ("[T]he independent source rule authorizes the seizure of evidence observed in plain view during an earlier illegal entry.").

To determine whether evidence initially discovered during an unlawful search is admissible based on a later executed warrant, the Ninth Circuit directs reviewing courts to "excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Vasey*, 834 F.2d at 788; *see also United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir. 2014) (citing *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994); *Driver*, 776 F.2d at 812 ("The warrant may be upheld even where it contains tainted and untainted facts as long as the untainted portions contain a sufficient showing of probable cause to render the warrant valid."). In *Murray*, the Supreme Court stated that in order to find a "search pursuant to a warrant was in fact a genuinely independent source of the

---

[1] In opposition, the Government appears to blend the inevitable discovery doctrine and the independent source doctrine. The two doctrines are closely related. *Lundin*, 817 F.3d at 1161; *see also Murray*, 487 U.S. at 539 ("The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine."). However, "[u]nlike the inevitable discovery doctrine, which asks whether evidence '*would have*' been discovered by lawful means rather than by means of the illegal search, the independent source doctrine asks whether the evidence *actually* was 'obtained independently from activities untainted by the initial illegality.'" *Lundin*, 817 F.3d at 1161 (internal citations omitted) (emphasis in original). While courts have expressed concern that allowing officers to invoke the inevitable discovery doctrine will encourage officers to "never obtain a warrant," courts have found the independent source doctrine does not create the same incentive. *Id.* at 1162.

information and tangible evidence at issue," the reviewing court should consider: (1) whether the officers' "decision to seek the warrant was prompted by what they had seen during the initial entry," and (2) whether "information obtained during that entry was presented to the magistrate and affected his decision to issue the warrant." 487 U.S. at 542.

Here, the search warrant affidavit referenced the evidence seen during the allegedly unlawful protective sweep. However, after excising this evidence from the search warrant affidavit, a considerable amount of untainted evidence remains. In the affidavit, Officer Sanders describes his training and experience as a probation officer since 2007. (ECF No. 32-2 at 6–7.) He explains he began his investigation after being informed Defendant, a known Fruitridge Vista Norteño associate, was involved in the sales of narcotics, and also after Defendant's wife informed him that Defendant did not live at his reported residence. (*Id.* at 8.)

Officer Sanders states on August 8, 2018, he observed Defendant drive to the Greenridge Apartments, park directly in front of Apartment 245 on the southeast side of the apartment complex, and walk into a breezeway toward Apartment 245. (*Id.*) Officer Sanders states on August 29, 2018, he and a team of officers observed Defendant drive to the Greenridge Apartments and park on the southeast side of the complex. (*Id.*) Officer Sanders states when the officers activated their emergency lights and directed Defendant to exit his vehicle, Defendant tossed a small, shiny object onto the grassy area next to the vehicle, which was later discovered to be a house key that belonged to Apartment 245. (*Id.*) Officer Sanders states he showed apartment staff a color photograph of Defendant and they confirmed seeing him at the complex on several occasions. (*Id.* at 9.) The apartment staff also told Officer Sanders they had observed Defendant driving a white SUV with large white rims, a vehicle that matched the description of a vehicle Officer Sanders had observed Defendant driving during the course of the investigation. (*Id.*) The apartment staff further advised Officer Sanders that Defendant was associated with Apartment 245 and they had observed him frequenting that unit several times. (*Id.*)

Officer Sanders also states Defendant was found in possession of two cell phones. (*Id.* at 10.) Defendant admitted owning the Samsung phone. (*Id.*) Because Defendant was on PRCS and subject to search and seizure of electronic devices, Defendant provided the passcode for his

Samsung phone. (*Id.*) Officer Sanders then states he reviewed the pictures on the phone and discovered pictures of Defendant holding a large amount of suspected methamphetamine. (*Id.*) Officer Sanders states he entered the GPS numbers attached to the pictures into a Google map search and found that the pictures were taken directly where Apartment 245 was located. (*Id.*) Officer Sanders states that based on his training and experience, he believed Defendant was using Apartment 245 to further his criminal activity. (*Id.*)

Importantly, "the standard for probable cause is not terribly demanding." *United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005). In the context of a search, it merely asks whether, under the totality of the circumstances, "there is fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) ("[P]robable cause means 'fair probability,' not certainty or even a preponderance of the evidence."). Here, as summarized above, the affidavit indicates the officers saw Defendant suspiciously toss a house key when he was stopped by the officers, the officers observed Defendant park near Apartment 245 on at least two occasions, and apartment staff told officers that Defendant was associated with Apartment 245 and had been seen there on several occasions. As such, there was ample untainted evidence in the affidavit connecting Defendant to Apartment 245.

Further, the affidavit indicates the officers found pictures of large amounts of suspected drugs on Defendant's cell phone prior to the protective sweep.[2] The affidavit also indicates that cell phone data showed the incriminating pictures and videos had been taken recently, and a search of the GPS location data associated with those pictures and videos revealed they were taken at or near Apartment 245. Looking at the totality of the circumstances, the Court concludes the affidavit contained sufficient untainted facts to support a finding that there was a "fair probability" that Apartment 245 contained evidence of Defendant's drug-related criminal activity.

Defendant does not challenge the untainted evidence, nor does he dispute that the

---

[2] The terms of Defendant's PRCS provided that his "possessions" were "subject to search at any time of the day or night, with or without a warrant." Cal. Penal Code § 3453(f). Defendant does not dispute that the cell phone the officers searched was one of his "possessions," nor does he challenge the search of the cell phone.

untainted evidence amounts to probable cause. Instead, Defendant argues that because Officer Sanders included the tainted evidence in the search warrant affidavit, it is impossible to know if the tainted evidence influenced the judge's decision to issue the warrant. Defendant also argues it is unclear if the tainted evidence prompted the officers to seek the warrant.

Defendant's arguments are unavailing. Given the considerable evidence known to the officers before entering Apartment 245, there is nothing to indicate the officers were prompted to apply for a search warrant of Apartment 245 solely based on what they found during the protective sweep. Moreover, as already discussed, Officer Sander's affidavit contained sufficient untainted evidence to support a finding of probable cause that contraband would be found in Apartment 245. Under Ninth Circuit precedent, the evidence discovered in Apartment 245 is admissible under these circumstances pursuant to the independent source doctrine. *See, e.g.*, *Reed*, 15 F.3d at 934 (concluding that after excising tainted evidence about drugs and drug paraphernalia seen during an illegal search from a warrant, the remaining untainted evidence was sufficient to establish probable cause for the warrant); *see also Salas*, 879 F.2d at 538 ("Excluding the evidence seized in [a motel room] solely because the officers erred in concluding that their initial entry was justified to prevent destruction of the evidence would place them in a worse position than if they had not blundered.").

Accordingly, the Court DENIES Defendant's motion.

### B. Denial of Evidentiary Hearing

"Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court." *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986). "An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue." *Id.*; *see also United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir. 1979).

Here, the Government does not seek an evidentiary hearing. (*See* ECF No. 32 at 25.) For his part, Defendant seeks an evidentiary hearing to allow witnesses to testify that Defendant was indeed living at his reported residence on the date of the search. (ECF No. 30 at 10.) However,

the question of whether Defendant actually resided at his reported residence is not material to this Court's determination. Therefore, the Court DENIES Defendant's request to hold an evidentiary hearing.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby DENIES Defendant's Motion to Suppress. (ECF No. 30.)

IT IS SO ORDERED.

DATED: June 19, 2020

Troy L. Nunley
United States District Judge